**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

HOPE MAYNARD and
ROGER MAYNARD, her husband,

                Plaintiffs,

v.                                  CIVIL  ACTION  NO.  3:09-1004

JEFFREY E. SHOOK, DPM,

                Defendant.

**ORDER**

Pending before the Court are the following motions filed by the defendant: (1) Daubert Motion to Preclude the Testimony of Bobby Miller, II, M.D. [Doc. 154]; (2) Motion to Preclude Any Use of or Reference to Any Issue Involving Jeffrey Shook, D.P.M.'s Prior Substance Abuse, Subsequent Rehabilitation, Consent Agreements, Treatment Prior to, During, or After the Alleged Negligence [Doc. 157]; (3) Motion to Preclude Any Use of or Reference to Dr. Shook Being Under the Influence During Plaintiff's Treatment [Doc. 159]; (4) Motion to Preclude Any Use of or Reference to West Virginia Professional Advocacy Group Effort and Brian McDevitt [Doc. 160]; and (5) Motion to Strike the Testimony of Dr. Steven Boc, D.P.M. as Set Forth in Plaintiffs' Supplemental Expert Disclosure. [Doc. 195]

The Court **GRANTS** each motion **IN PART** and **DENIES** each motion **IN PART** in accordance with the reasoning set forth in this Order.

**DISCUSSION**

In 2007, plaintiff Hope Maynard was referred to the defendant Jeffrey Shook, D.P.M. for joint pain and swelling in her left ankle. Defendant performed a medial displaced calcaneal osteotomy with flexor digitorum longus tendon transfer and a naviculocuneiform joint fusion. Thereafter, Ms. Maynard allegedly suffered significant complications including pain and swelling, and a walking impairment for which she later needed additional surgery. For that reason, in September of 2009, Ms. Maynard, along with her husband, filed the instant medical malpractice action against the defendant.

The Court need not give an extended account of the facts in this case inasmuch as the parties are familiar with the substantive bases of the instant motions. Suffice it to say that each of these motions in some manner or another concerns the plaintiffs' allegation that the defendant was addicted to pain prescription medication or physically and mentally impaired at the time he treated Ms. Maynard. Prior to treating Ms. Maynard, the defendant enrolled in a voluntary physician health program for substance abuse—the West Virginia Professional Advocacy Group Effort ("WV-Page")—designated by the West Virginia Board of Medicine ("WVBOM"). His medical license was inactive while he participated in the program. Subsequently, he was then allowed to practice with restrictions including the requirement that he continue to participate in treatment.

The plaintiffs principally seek to offer evidence that the defendant was an "impaired physician" under guidelines established by the American Medical Association ("AMA")—and adopted by the WVBOM—which essentially provide that a physician is unfit to practice medicine if he engages in "excess use or abuse of drugs, including alcohol." Pls.' Resp. to Mot. for Partial Summ. J. Ex. 2, at 2, No. 71-2. The defendant, in response, contends that West Virginia law

-2-

explicitly provides that any information relating to voluntary substance abuse treatment programs is to be kept confidential, and in any event, is inadmissible in medical malpractice proceedings.

On July 8, 2010, Magistrate Judge Stanley found that the defendant could not invoke the protections of West Virginia privilege law because the contested records are no longer confidential as they are readily available over the internet due to the defendant's dissemination of the information when he applied to practice medicine in Ohio. Because Ohio has adopted more relaxed confidentiality rules for information assimilated in voluntary substance abuse treatment programs, this Court concluded that the defendant effectively waived any privilege he may have had by becoming admitted there.

## I.      West Virginia Statutory Privilege

Under West Virginia law, physicians are encouraged to voluntarily enter into monitored chemical dependency programs at the direction of the WVBOM. *See* W. Va. Code § 30-3-9(h)(1). Where a physician enters into a voluntarily agreement to participate in a physician health program to combat an addiction in accordance with the provisions of § 30-3-9(h)(1), the law does not consider him the subject of a formal disciplinary action. *Id.* § 30-3-9(h)(2). Subsection 30-3-9(h)(4) further provides the following:

> If the board has not instituted any disciplinary proceeding as provided for in this article, any information received, maintained or developed by the board relating to the alcohol or chemical dependency impairment of any physician, podiatrist or physician assistant and any voluntary agreement made pursuant to this subsection shall be confidential and not available for public information, discovery or court subpoena, nor for introduction into evidence in any medical professional liability action or other action for damages arising out of the provision of or failure to provide health care services.

*Id.* § 30-3-9(h)(4).  At the pretrial motions hearing on March 7, 2011, this Court ordered additional

briefing on the impact of § 30-3-9(h)(4) on many of the evidentiary questions presented in the instant motions. The plaintiffs argue that evidence relating to the defendant's voluntary participation in WV-Page and his prior abuse of Hydrocodone should be admitted because it tends to show that the defendant was an "impaired physician" as that term is defined under the AMA Guidelines. The Court disagrees.

In construing West Virginia law, courts should first follow the clear and unambiguous language of any statute in question. *See Appalachian Power Co. v. State Tax Dep't*, 466 S.E.2d 424, 438 (W. Va. 1995). In the Court's view, § 30-3-9(h)(4) by its plain terms prevents the introduction of evidence of information received, maintained or developed by the WVBOM that, in any respect, relates to the chemical dependency of a physician involved in a voluntary assistance program.

A district court sitting in diversity should not apply a more relaxed federal rule of admissibility if that rule is "'so intertwined with a state substantive rule'" that following it would fail to "'give full effect to the state's substantive policy.'" *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 110 (4th Cir. 1995) (quoting *DiAntonio v. Northampton-Accomack Memorial Hosp.*, 628 F.2d 287, 291 (4th Cir. 1980)). Section 30-3-9(h)(4) reflects the West Virginia Legislature's decision to endorse a strong policy encouraging physicians to self-report any chemical dependencies so that the WVBOM may both closely monitor its doctors and protect patients in the state.

While the Court previously intimated that the defendant had waived any claim of confidentiality in the information at issue, that holding was applicable in the context of the defendant's request for a protective order. However, in light of West Virginia's strong policy in favor of physician self-reporting, § 30-3-9(h)(4) clearly provides that, in such cases and in the absence of the initiation of a disciplinary proceeding, evidence of chemical dependency received by

-4-

the board is *both* confidential *and* inadmissible in medical malpractice cases. The Court's previous

finding that chemical dependency information was discoverable does not imply its admissibility.[1]

Here, information regarding the defendant's participation in WV-Page came to light only

because of his decision to become licensed in Ohio. Because Ohio has chosen to adopt rules

permitting public disclosure of a physician's participation in a voluntary assistance program, it

would stretch reason to assume that the information could remain privileged in all cases. But, as

discussed, the West Virginia Legislature has chosen to give physicians *additional* protection in

specifying that such evidence is not admissible in medical malpractice cases.[2] Consequently, any

evidence relating to the defendant's treatment and testing for chemical dependency that was

received, maintained or developed by the board as a result of the defendant's voluntary agreement

is inadmissible. For the same reason, any evidence of the defendant's participation in WV-Page is

inadmissible.

## II.      Reliability of the Plaintiffs' Proposed Experts' Reports

Although the Court does not rest its holding on the relevance and reliability of the plaintiffs'

evidence of drug abuse, it does note that the plaintiffs have not shown how the testimony of Dr.

---

[1] The rules on discovery are of course broader than the rules on admissibility. *Cf.* Fed. R. Evid. 404(a) (noting that evidence of a person's character is not admissible for proving conduct in conformity therewith on a particular occasion—despite the fact that such evidence may be discoverable).

[2] In contrast, the West Virginia Legislature has created a privilege which protects against the discovery or admission of the records of a peer review organization. *See* W. Va. Code § 30-3C-1, *et seq*. However, the peer review privilege is subject to statutorily-authorized exceptions. *See id.* § 30-3C-3 (noting that information related to peer review records may be obtained from "original sources," and the privilege from disclosing it may, in some instances, be validly waived). Section 30-3-9(h)(4) contains no language authorizing waiver of confidentiality or any exceptions to the general ban on the admission of information "received, maintained or developed" by the board relating to a physician's chemical dependency impairment.

Miller that the defendant's past addiction and his conduct and mannerisms on the day of the alleged

negligence establishes that he was either under the influence of Hydrocodone when he performed

surgery on Ms. Maynard or an "impaired physician" under the AMA Guidelines.[3]  Under *Daubert*

*v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth a five-factor

test to evaluate the reliability of proffered expert testimony:

> (1) Whether the technique or theory [relied upon by the expert] can be or
> has been tested; (2) Whether the theory has been subject to peer review
> and publication; (3) the known or potential rate of error; (4) the existence
> and maintenance of standards and controls governing the technique's
> operation; and (5) the degree to which the theory or technique enjoys
> general acceptance within the relevant scientific community.

*See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1995) (paraphrased and internal

quotation marks omitted). Moreover, district courts are given broad discretion to decide whether

expert testimony should be admitted.  *See Hughes v. Sears, Roebuck &Co.*, No. 2:09-cv-93, 2010

U.S. Dist. LEXIS 133388, at *9 (N.D. W. Va. Dec. 16, 2010).

In essentially concluding that the defendant was either physically or mentally impaired or

under the influence of Hydrocodone when he performed the surgery, Dr. Miller bases his expert

report primarily on the AMA Guidelines and Ms. Maynard's lay observations of the defendant's

conduct on that day.  The AMA Guidelines, as Dr. Miller concedes, are designed to assist physicians

in recognizing the signs and symptoms of drug or alcohol addiction of their colleagues so that they

---

[3] The Court finds unpersuasive the plaintiffs' contention that Dr. Miller's testimony is not
necessarily meant to establish that the defendant was under the acute effects of Hydrocodone use
when he operated on Ms. Maynard. Plaintiffs seek to create an inference that the defendant was
in fact using such drugs on the date of surgery by evidence that he had a history of drug abuse
and that he resisted appropriate drug testing a few days prior.  As explained more fully *infra*,
while perhaps suspicious, these facts are not sufficiently probative to outweigh their prejudicial
effect.

may comply with their ethical reporting obligations.  Pls.' Resp. to Mot. for Partial Summ. J. Ex.
2, at 2-3, No. 71-2.  The Guidelines were not designed to reliably diagnose physical or mental
impairment.  In deposition, for example, Dr. Miller characterized the Guidelines as simple "red
flags" for fellow physicians' awareness—not diagnostic criteria.  *See* Miller Dep. 83:7 – 84:20, Feb.
16, 2011 ("[I]t's in the literature as red flags.  We will call [identifiers] red flags.").

Dr. Miller also relied on the reports of the defendant's monitoring physician who had
diagnosed him with clinical depression and chemical dependency months before the surgery. This
diagnosis was part of the voluntary agreement, and is thus inadmissible in accordance with reasoning
set forth in Section I, *supra*; however, the evidence also fails to show that the defendant suffered
from any condition affecting his performance on the day of the surgery.  Aside from the diagnosis,
the plaintiffs have no evidence that the defendant's medical condition rendered him unable to treat
patients.  With no positive drug test or other substantive evidence, the plaintiffs cannot show with
a reasonable probability that the defendant was impaired or under the influence of an illegal drug
at the time of treatment.  Ms. Maynard's vague and subjective observations of the defendant's
bedside manner, without more, cannot suffice.  The diagnostic contours of Dr. Miller's report are
not specific to recognizing the effects of Hydrocodone, and they would be confusing to the jury.
While expert testimony may be admitted where it will aid the trier of fact in resolving a question that
concerns complicated scientific or technical issues, the testimony must nonetheless be sufficiently
reliable.  *See Kumho Tire*, 526 U.S. at 149-50.  Here, it is not.[4]

---

[4] On a related issue, the Court finds inadmissible the plaintiffs' evidence regarding the
defendant's financial trouble as detailed in the WV-Page documents.  Of course, this is not to say
that any residual evidence of the defendant's financial difficulty is not probative on the issue of
gross negligence.  However, absent more, the Court is reluctant to conclude that the probative
value of this evidence—i.e., that the defendant was in debt at the time of conducting the

Finally, the Court finds admissible Dr. Steven Boc's proposed testimony regarding whether the defendant deviated from the applicable standard of care in failing to explore alternative treatment options. The defendant has filed a motion attempting to exclude the portion of Dr. Boc's testimony reasoning that the defendant violated the standard of care and Ms. Maynard's right to informed consent by failing to advise her both on the restrictions on his license, or his past or current treatment under the voluntary agreement. As to this issue, the Court concludes that, at the time of the surgery, the defendant had not waived his right to confidentiality in the information relating to the voluntary assistance program he entered pursuant to the provisions of West Virginia Code § 30-3-9(h)(1). The Court cannot conceive that the West Virginia Legislature intended § 30-3-9(h)(4) to protect this type of information, but require its disclosure when a physician obtains informed consent to treat a patient. Therefore, even if the evidence is discoverable, the plaintiffs have offered no support for the proposition that the defendant had to disclose it at the time of treating Ms. Maynard in contravention of the protections set forth in § 30-3-9(h)(4).

## CONCLUSION

In accordance with the foregoing Order, the following motions, (1) Daubert Motion to Preclude the Testimony of Bobby Miller, II, M.D. [Doc. 154]; (2) Motion to Preclude Any Use of or Reference to Any Issue Involving Jeffrey Shook, DPM's Prior Substance Abuse, Subsequent Rehabilitation, Consent Agreements, Treatment Prior to, During, or After the Alleged Negligence [Doc. 157]; (3) Motion to Preclude Any Use of or Reference to Dr. Shook Being Under the Influence During Plaintiff's Treatment [Doc. 159]; (4) Motion to Preclude Any Use of or Reference to West Virginia Professional Advocacy Group Effort and Brian McDevitt [Doc. 160]; and (5)

---

surgery—outweighs its prejudicial effect.

Motion to Strike the Testimony of Dr. Steven Boc, D.P.M. as Set Forth in Plaintiffs' Supplemental

Expert Disclosure [Doc. 195], are **GRANTED** insofar as they seek to exclude evidence at trial of

any information received, maintained or developed by the WVBOM relating to the defendant's

participation in WV-Page and the defendant's alleged chemical dependency and treatment that

constituted the subject of his voluntary consent agreement.  To the extent that any of the instant

motions concern evidence outside of this holding, they are **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented parties.

ENTER:          March 30, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE